STATE OF CONNECTICUT *v.* ALIA K. ALTAJIR
(SC 18706)

Rogers, C. J., and Norcott, Palmer, Zarella, McLachlan and Harper, Js.

Argued October 19, 2011—officially released January 3, 2012

*Moira L. Buckley*, with whom was *Morgan P. Rueck-ert*, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, was *David Shepack*, state's attorney, for the appellee (state).

*Opinion*

HARPER, J. In this certified appeal, the defendant, Alia K. Altajir, appeals from the judgment of the Appellate Court affirming the judgment of the trial court revoking the defendant's probation and sentencing her to three years incarceration. See *State* v. *Altajir*, 123 Conn. App. 674, 689, 2 A.3d 1024 (2010). On appeal to the Appellate Court, the defendant claimed that the trial court had violated her right to due process under the fourteenth amendment of the United States constitution and article first, § 8, of the constitution of Connecticut by improperly admitting, during the dispositional phase of a probation revocation proceeding, a number of undated photographs gathered from Facebook, a social network website on which the defendant maintained a profile.[1] The Appellate Court concluded that this claim

[1] "Each [Facebook] user maintains a 'profile,' which is a webpage containing basic information such as the individual's year of graduation and home town, as well as personal information, such as his or her name and whether he or she is single or in a relationship (i.e., 'relationship status'). Users may inform others about what they are doing by changing the 'current status' message that appears at the top of the profile. . . .

"Facebook allows users to designate 'friends.' An individual who is invited to be a member's Facebook friend may either accept or reject the offer, thus providing individual control over one's list of friends. The user can

was unpreserved and that it did not merit review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). We assume, without deciding, that the claim was preserved and we affirm the Appellate Court's judgment on the ground that the photographs satisfied the minimum standard of reliability constitutionally required to admit evidence at the dispositional phase of a probation revocation hearing.

The record reveals the following undisputed facts and procedural history. In July, 2004, the then nineteen year old defendant operated an automobile while under the influence of alcohol. She lost control of her vehicle, which was carrying two passengers, and inadvertently drove off the road, down an embankment and into a river. One of the passengers drowned as a result of the accident. In October, 2006, the defendant pleaded nolo contendere to charges of misconduct with a motor vehicle in violation of General Statutes § 53a-57 and

---

control how much information to post and who can view this information by editing their privacy settings. Specific groups of people (a network or friends) may be granted limited access to specific parts of the profile.

"Facebook members can upload digital pictures into virtual photo albums. A user can be 'tagged' in these pictures so that his or her name appears in the caption as a link to his or her profile. If the individual does not want to be associated with the picture, he or she can 'untag' it, thereby removing the name and the link (though this does not remove the picture). Members are able to post comments on photos, which appear as messages below the picture." T. Pempek et al., "College Students' Social Networking Experiences on Facebook," 30 J. Applied Developmental Psychol. 227, 230 (2009). Additional details regarding aspects of Facebook directly relevant to this appeal will be provided as necessary.

Due to the dynamic nature of Facebook and other such social network sites, these details, as well as basic structural features of the social network, are subject to frequent modification. Care should therefore be taken to assess information relating to social network sites on a case-by-case basis, with due attention to the nature of the site at the time relevant to the case. Up-to-date information regarding Facebook may be found in the "help" section of the Facebook website, http://www.facebook.com/help/?page= 260315770650470. Further explanations of Facebook related terminology may be found in the website's glossary, http://www.facebook.com/help/ glossary.

operating a motor vehicle while under the influence by a person under twenty-one years of age in violation of General Statutes § 14-227g. In accordance with a plea agreement, the trial court, *Brunetti, J.*, imposed a sentence of five years of incarceration, suspended after one year, and five years of probation. The trial court also imposed a number of special conditions of probation, including that the defendant install an ignition interlock device on any vehicle she owned or operated and that she not operate a motor vehicle without a valid license. The trial court at sentencing "stress[ed] to this defendant that the treatment conditions, postincarceration, are very important and will certainly be enforced as aggressively as possible by the state." The court further specified that "[i]f you do ten out of eleven [special conditions of probation] that is not good enough. If you violate one of those conditions you could be violated and wind up serving the balance of the four years."

The defendant was released from prison in 2008, after serving the nonsuspended year of her sentence. While on probation in 2009, she was involved in a minor motor vehicle accident. The accident did not involve alcohol use; police determined, however, that she was operating a vehicle without the requisite ignition interlock device and that she had not restored her driver's license following its temporary suspension. The defendant subsequently admitted to violating the special conditions of probation that prohibited her from engaging in that conduct.

At a subsequent dispositional hearing, the state recommended that the court revoke the defendant's probation and impose the remaining four years left to serve on her underlying sentence. The state characterized the defendant as a "marginal probationer" who had failed to obtain a job, further her education or provide sufficient evidence of community service while on probation. The state proceeded to emphasize that the defendant is

"maintaining [a] Facebook site, and this is put out on the public domain for people to see. And when one looks at the Facebook site . . . [one sees] that there were multiple, multiple, multiple occasions where this defendant had left the state of Connecticut without permission during that period of time between the start of probation and the violation of probation. We see evidence that she's in Florida . . . [and] in New York City. . . .

"But the other thing we see, Your Honor, in all of these pictures is again [the defendant] worshipping at the altar of alcohol and debauchery and lewd behavior. And why is that significant? It's significant because the message didn't get sent, and this individual refused to accept it."

Defense counsel in turn suggested that the court look to the severity of the offenses underlying the defendant's probation violations, arguing that the commission of an infraction (driving without restoring her license) and a class C misdemeanor (driving without the ignition interlock device), neither of which involved alcohol, warranted a more lenient sentence. In response to the state's argument regarding information gleaned from the defendant's Facebook page, defense counsel countered that the alcohol related behavior evident on the defendant's Facebook profile was reflective of prevailing social norms, that the images were not representative of the way the defendant spent most of her time and that the photographs were undated. Defense counsel also contested the state's basis for asserting that the defendant had been to New York or Florida but noted that she had been granted permission from a probation officer to travel to New York.

The trial court, *Ginocchio, J.*, noted that photographs on Facebook of the defendant consuming alcohol had played an aggravating role at the defendant's sentencing

for the underlying offense and that "now after she's done her time and she's come back before the court now, she still has the audacity to go back on Facebook and show herself in the condition of being intoxicated. . . . [W]hy would someone, knowing what was at stake here, do that again? It's baffling . . . but maybe she'll address it, or [counsel] can address it, but it doesn't make any sense."

Shortly thereafter, the defendant took the opportunity to address the court, at which point she apologized for "everything that has taken place" and asserted that she no longer drove after drinking. She acknowledged through counsel, however, that she did continue to consume alcohol, and she did not contest the state's characterization of the photographs viewable on her Facebook profile. When the court later offered the defendant the opportunity to say more, she replied, "No."

Subsequent to the defendant's allocution, the state sought to introduce printed copies of approximately seventy photographs, along with associated captions and comments, purportedly viewable on the defendant's Facebook page. The state presented no evidence regarding how these photographs had been acquired, who could view the defendant's Facebook profile or how Facebook's features governing publicity and privacy functioned during the relevant time period.[2] In support of the images' admission, the state argued that "the court has the authority to consider a wide range of information as long as there is some indicia of reliability, and it seems to me that all parties have talked about this. It informs everyone's position . . . ." Defense

[2] As we note elsewhere; see footnotes 1, 3 and 7 of this opinion; customizable privacy settings allow individual Facebook users to exercise considerable control over the availability of information associated with· their profiles. Moreover, the social network's general infrastructure, including these privacy settings, is highly dynamic and in many cases may be accurately assessed only with reference to a limited time period.

counsel objected, stating that "I don't think any of that provides a foundation for the violation of probation, which is at issue here, and so I think it sets up a due process issue with the court considering collateral and extraneous matters with this proceeding." The court overruled the defendant's objection and allowed the images to be marked as a full exhibit, reasoning that it could consider any evidence in a sentencing hearing as long as the evidence was found to be reliable.

The court then stated that it would give defense counsel an opportunity to review the images, captions, and commentary. In response to defense counsel's comments that "I'm kind of put on the spot. I'm trying to look at all of these before they're submitted to the court," the court granted the defendant a ten minute recess. After the recess, the state represented that the parties had agreed to eliminate approximately one half of the photographs, so the proffered exhibit now included only "pictures that border on the issue of alcohol or [the defendant] being out of the state." At this point, defense counsel interjected, "[a]nd I would just note, Judge, that none of the photos appear to be dated. They're undated. And I'm not sure there is any way to prove that that was during the period of probation." Defense counsel further indicated that the defendant's Facebook page was designed to be viewed by a limited number of people, that the photographs were not necessarily posted by the defendant herself, that the defendant was of legal drinking age and that drinking alcohol was not itself a violation of probation. The state responded that the images depicted alcohol related behavior, that this depiction "certainly leads to a reasonable inference, if you're drinking, that you may very well be drinking and driving" and that several of the photographs show the defendant in locations outside of Connecticut. With respect to dating the photographs, the state noted that the printed pages indicate when the images were posted to Facebook. The state further

noted, apparently in reference to the fact that the defendant appears to have light colored hair in some photographs and darker hair in others, that the defendant's hair became darker after her incarceration.

Thirty-six images were ultimately admitted into evidence. They depict the defendant and/or the defendant's friends in various social settings; many demonstrate or suggest alcohol consumption by the defendant. Seven of the images are from a Facebook album associated with the defendant's account entitled "random old pics," and another five are from the defendant's album entitled "this is why im hot." These twelve photographs were posted on Facebook in 2009. Two of these photographs, both from the "random old pics" album, depict the defendant with alcohol. Another two, from the same album, appear to be taken at Yankee Stadium in New York. The remaining twenty-four images, uploaded between 2007 and 2009, were posted by other Facebook users to their own albums. The defendant was "tagged" as appearing in these photographs; see footnote 1 of this opinion; and these tagged photographs were then viewable on a page of the defendant's Facebook profile displaying all of the photographs in which she appeared.[3] A number of these photographs show the

[3] Of these twenty-four photographs, sixteen appear to have been accessed by viewing this page of the defendant's Facebook profile; the remaining eight photographs appear to have been gathered from albums on other Facebook users' pages rather than from the defendant's own profile. It is possible to infer that all but one of those eight photographs could be viewed on the defendant's profile because a hyperlink "tag" bearing her name accompanies each photograph. The one photograph that bears no such tag depicts the defendant but appears otherwise not to have been associated at all with her Facebook profile.

As we previously have noted; see footnote 1 of this opinion; Facebook is constantly changing. At the time of sentencing, a Facebook user could place restrictions on who could "untag" a photograph, removing the link between the user's album and one's own profile; a user was not able, however, to delete the photograph from the other user's album to which it was originally posted. See T. Pempek et al., "College Students' Social Networking Experiences on Facebook," 30 J. Applied Developmental Psychol. 227, 230 (2009).

defendant consuming alcohol in social settings, including on a boat in photographs from an album entitled "Boca Bashhhhh" posted in 2009.

After receiving this evidence and hearing statements from the victim's father and from a friend of the defendant, the court indicated that it would have imposed the full four year sentence had the defendant committed an alcohol related violation of probation, but that the limited severity of the infraction in this case made the decision more difficult. The court then proceeded to explain why a three year sentence was nonetheless appropriate: "I'm looking at these pictures again and all I can think of is where is the remorse? . . . [In] every one of these pictures you look like a person that's completely forgotten about what has happened and what led you to this situation today. . . . [W]here [the] death of a young person is involved and you bring unspeakable grief to his family, you don't get a second chance in my opinion. You had to do it right the first time. . . .

"I sat here all morning and I still at times did not know what to do. I had to listen to everything to get a whole picture. It's difficult. I do believe that the beneficial purposes of probation are no longer being served. She is not an appropriate candidate for probation. She went about her life consuming a large amount of alcohol, and if she was drinking like this as seen in the pictures, and she was driving, she was driving. I'm not saying she was driving while intoxicated . . . . Her not doing two conditions of probation is egregious. I was thinking about continuing her on probation with a jail sentence, but I'm going to end this today." The court then terminated probation and sentenced the defendant to three years of incarceration.

The defendant appealed to the Appellate Court, raising several due process claims. The Appellate Court

affirmed the trial court's judgment, concluding, inter alia, that the defendant's claim that the Facebook photographs were unreliable was unpreserved and did not merit review under *Golding* because the claimed violation was not of constitutional magnitude. *State* v. *Altajir*, supra, 123 Conn. App. 687. This court thereafter granted the defendant's petition for certification to appeal limited to the following questions: "Did the Appellate Court properly decline to review the defendant's claim that she was deprived of due process because the sentencing court allowed the state to introduce allegedly unreliable Facebook material into evidence, which the court relied upon at sentencing, and if so, whether the defendant was in fact deprived of her due process rights?" *State* v. *Altajir*, 299 Conn. 902, 10 A.3d 520 (2010). We assume, without deciding, that the defendant preserved her claim that the photographs were unreliable because it is evident from the facts of the present case that the defendant cannot establish that the admission of the photographs deprived her of due process. See *State* v. *Cator*, 256 Conn. 785, 791–92, 781 A.2d 285 (2001) (assuming, without deciding, preservation issue); *State* v. *Haase*, 243 Conn. 324, 338 n.12, 702 A.2d 1187 (1997) (same), cert. denied, 523 U.S. 1111, 118 S. Ct. 1685, 140 L. Ed. 2d 822 (1998).

We begin by addressing the standards under which we review the defendant's due process claim.[4] "A revocation of probation hearing has two distinct components . . . . A factual determination by a trial court as to whether a probationer has violated a condition of probation must first be made. If a violation is found, a

---

[4] "Although we note that [t]he due process provisions of the state and federal constitutions generally have the same meaning and impose similar constitutional limitations . . . in this case, [t]he defendant has not offered any independent and adequate analysis under the state constitution. We therefore confine our analysis to [her] claims under the federal constitution." (Citation omitted; internal quotation marks omitted.) *State* v. *Andresen*, 256 Conn. 313, 318 n.5, 773 A.2d 328 (2001).

court must next determine whether probation should be revoked because the beneficial aspects of probation are no longer being served.· . . . Since there are two distinct components of the revocation hearing, our standard of review differs depending on which part of the hearing we are reviewing." (Internal quotation marks omitted.) *State* v. *Fagan*, 280 Conn. 69, 104, 905 A.2d 1101 (2006), cert. denied, 549 U.S. 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 286 (2007).

In the present case, the defendant has admitted to violations of the conditions of her probation and contests only the trial court's decision to revoke probation and reimpose three years of her original prison sentence. "The standard of review of the trial court's decision at the [dispositional] phase of the revocation of probation hearing is whether the trial court exercised its discretion properly by reinstating the original sentence and ordering incarceration. . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Preston*, 286 Conn. 367, 377, 944 A.2d 276 (2008).

In this exercise of broad discretion, however, the trial court must continue to comport with the requirements of due process. The United States Supreme Court has recognized that "[b]oth the probationer . . . and the [s]tate have interests in the accurate finding of fact and the informed use of discretion—the probationer . . . to insure that his liberty is not unjustifiably taken away and the [s]tate to make certain that it is neither unnecessarily interrupting a successful effort at rehabilitation nor imprudently prejudicing the safety of the community." *Gagnon* v. *Scarpelli*, 411 U.S. 778, 785, 93 S. Ct. 1756, 36 L. Ed. 2d 656 (1973); id., 781–82 (applying due

process principles to probation revocation proceeding). Our review of whether the trial court engaged in such an "informed use of discretion"; id., 785; is in turn governed by the well established standards for reviewing a trial court's exercise of similarly broad discretion at sentencing in a criminal trial.[5]

It is a fundamental sentencing principle that a sentencing "judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider or the source from which it may come." *United States* v. *Tucker*, 404 U.S. 443, 446, 92 S. Ct. 589, 30 L. Ed. 2d 592 (1972). In keeping with this principle, we have recognized that "[a] sentencing judge has very broad discretion in imposing any sentence within the statutory limits and in exercising that discretion he may and should consider matters that would not be admissible at trial. . . . Generally, due process does not require that information considered by the trial judge prior to sentencing meet the same high procedural standard as evidence introduced at trial. Rather, judges may consider a wide vari-

---

[5] This court has indicated that "the disposition phase of a probation revocation proceeding is, in substance, largely indistinguishable from the sentencing that follows a criminal prosecution"; *State* v. *Strickland*, 243 Conn. 339, 349, 703 A.2d 109 (1997); and the Appellate Court has applied this court's standard for reviewing discretionary consideration of evidence at sentencing, articulated in *State* v. *Huey*, 199 Conn. 121, 505 A.2d 1242 (1986), to probation revocation proceedings. See, e.g., *State* v. *Young*, 63 Conn. App. 794, 800, 778 A.2d 1015 ("The [probation revocation] process, however, is not so flexible as to be completely unrestrained; there must be some indication that the information presented to the court is responsible and has some minimal indicia of reliability. *State* v. *Huey*, supra, [127]."), cert. denied, 258 Conn. 903, 782 A.2d 140 (2001). Although this court has not yet had occasion to consider this issue, the parties in the present case agree that the criminal sentencing standard applies. We note, however, that, although the due process requirements for criminal sentencing hearings and probation revocation dispositional hearings are generally indistinguishable, the noncriminal nature of probation proceedings does not give rise to identical constitutional protections. See footnote 6 of this opinion (discussing self-incrimination privilege in context of revocation of probation).

ety of information." (Citations omitted; internal quotation marks omitted.) *State* v. *Bletsch*, 281 Conn. 5, 20, 912 A.2d 992 (2007).

We have cautioned, however, that "[t]he trial court's discretion . . . is not completely unfettered. As a matter of due process, information may be considered as a basis for a sentence only if it has some minimal indicium of reliability." (Internal quotation marks omitted.) *State* v. *Eric M.*, 271 Conn. 641, 650, 858 A.2d 767 (2004). As we have long recognized, in keeping with due process, a defendant "may not be sentenced on the basis of improper factors or erroneous information." *State* v. *Thompson*, 197 Conn. 67, 77, 495 A.2d 1054 (1985). Further, "courts must be concerned not merely when a sentencing judge has relied on demonstrably false information, but [also] when the sentencing process created a significant possibility that misinformation infected the decision." (Internal quotation marks omitted.) *United States* v. *Lemon*, 723 F.2d 922, 933 (D.C. Cir. 1983). Nonetheless, "[a]s long as the sentencing judge has a reasonable, persuasive basis for relying on the information which he uses to fashion his ultimate sentence, an appellate court should not interfere with his discretion." (Internal quotation marks omitted.) *State* v. *Bletsch*, supra, 281 Conn. 21.

In considering a claim that the trial court relied on unreliable information at sentencing, we therefore conduct a two-pronged inquiry: first, did the information at issue contain some minimal indicium of reliability; second, if it did not, did the trial court substantially rely on this improper information in fashioning its ultimate sentence? See *State* v. *Collette*, 199 Conn. 308, 321, 507 A.2d 99 (1986) ("the mere reference [by the sentencing court] to information outside of the record does not require a sentence to be set aside unless the defendant shows: [1] that the information was materially false or

unreliable; and [2] that the trial court substantially relied on the information in determining the sentence").

With respect to the threshold inquiry into reliability, we note that "[t]here is no simple formula for determining what information considered by a sentencing judge is sufficiently reliable to meet the requirements of due process. The question must be answered on a case by case basis." (Internal quotation marks omitted.) *State v. Eric M.*, supra, 271 Conn. 651. We have repeatedly affirmed, however, a general principle relevant to this case, namely, that "the *absence of a denial* itself provides an important [indicium] of reliability." (Emphasis added.) *United States v. Bass*, 535 F.2d 110, 121 (D.C. Cir. 1976) ("[T]his appellant did not dispute the truthfulness of the allegations at sentencing. . . . We see no reason to bar sentencing judges from considering relevant information whose accuracy is not disputed."). In *State v. Anderson*, 212 Conn. 31, 49–50, 561 A.2d 897 (1989), we highlighted the fact that "the defendant had an opportunity to speak at the sentencing hearing where he could have disputed the court's observations; however, he declined to do so. The absence of a denial itself provides an important indicium of reliability." Similarly, in *State v. Eric M.*, supra, 653, we commented: "In the present case, the defendant has not established that the statements in the article attributed to him were materially false or unreliable. Significantly, he never disputed having made the statements to the author, nor did he take the opportunity to quarrel with the author's construal of his remarks. See *United States v. Bass*, [supra, 121] (absence of denial itself provides important indicium of reliability). Nor did he seek a continuance to afford himself the opportunity to address the article." See also *State v. Huey*, 199 Conn. 121, 131–32, 505 A.2d 1242 (1986) (*Healey, J.*, concurring) (suggesting that, where sentencing court considered evidence of conduct that defendant persistently denied and had not pleaded

guilty to, "[o]ne might also argue that his denial may have attenuated somewhat the offered indicium of reliability of otherwise inadmissible evidence"). This approach is in accord with a presumption applied under the general rules of evidence: "When a statement, accusatory in nature, made in the presence and hearing of an accused, is not denied or explained by him, it may be received into evidence as an admission on his part. . . . Although evidence of silence in the face of an accusation may be admissible under the ancient maxim that silence gives consent the inference of assent may be made only when no other explanation is consistent with silence."[6] (Citations omitted; internal quotation marks omitted.) *State* v. *Leecan*, 198 Conn. 517, 522–23, 504 A.2d 480 (1986).

With these considerations in mind, we turn to the particular facts of the present case. The evidence of reliability proffered by the state here is, at best, limited, and certainly would not be sufficient under the rules of evidence at a trial. The state contends that under the much less stringent standard for admissibility at probation proceedings its uncontested representation to the court that the defendant had darker colored hair

---

[6] We recognize that the United States Supreme Court has held with respect to criminal trials: "The [g]overnment retains the burden of proving facts relevant to the crime at the sentencing phase and cannot enlist the defendant in this process at the expense of the self-incrimination privilege. . . . By holding [the] petitioner's silence against her in determining the facts of the offense at the sentencing hearing, the District Court imposed an impermissible burden on the exercise of the constitutional right against compelled self-incrimination." (Citation omitted.) *Mitchell* v. *United States*, 526 U.S. 314, 330, 119 S. Ct. 1307, 143 L. Ed. 2d 424 (1999). This concern over self-incrimination is not present, however, in the context of probation revocation: "Although a revocation proceeding must comport with the requirements of due process, it is not a criminal proceeding. . . . Just as there is no right to a jury trial before probation may be revoked, neither is the privilege against compelled self-incrimination available to a probationer." (Citation omitted.) *Minnesota* v. *Murphy*, 465 U.S. 420, 435 n.1, 104 S. Ct. 1136, 79 L. Ed. 2d 409 (1984).

after her incarceration, consistent with her appearance in some of the photographs, coupled with the presence of upload dates on the photographs, provided an adequate basis for the court to rely on the photographs as depictions of the defendant's behavior during probation.[7] In refutation, however, the defendant has offered even less. At no point did the defendant deny the state's clear and repeated assertion that these photographs represented her behavior while on probation. Strikingly, in her allocution the defendant made no attempt to counter the state's accusation that she appeared in these photographs "again . . . worshipping at the altar of alcohol and debauchery and lewd behavior" or to respond to the court's expressed bafflement that "she still has the audacity to go back on Facebook and show herself in a condition of being intoxicated." Instead, the defendant admitted, partially through counsel, that she continued to drink alcohol and denied only the suggestion that she ever drove after drinking.

---

[7] The state also contended at oral argument before this court that the mere fact that during her period of probation the defendant's limited access Facebook profile displayed images of her consuming alcohol, regardless of when the photographs were taken, provided adequate warrant for considering those images. We reject this contention for several reasons. The state offered no evidence that the images were viewable by the public at large, and the defendant expressly declared that they were not public in this manner. More, upon closer examination, it is clear that only two of the alcohol related images at issue were uploaded by the defendant herself and that a number of the other relevant images were accessed and printed not by visiting the defendant's own Facebook profile but by visiting the profiles of other Facebook users. It is therefore only by inference, unsubstantiated by evidence presented by the state, that the court could have gleaned that these images likely appeared on the defendant's profile as well as on the profiles on which they were posted. Given the state's complete failure to substantiate its controverted characterization of the defendant's Facebook profile and the fragmentary nature of the evidence presented, the court could not, as an "informed use of discretion"; *Gagnon* v. *Scarpelli,* supra, 411 U.S. 785; reasonably have determined, solely on the basis of the photographs submitted to it, that the defendant's Facebook profile represented a "shrine to alcohol and celebrated consumption of alcohol and partying," as the state argues on appeal.

Subsequent to the defendant's allocution, the state moved to admit the Facebook photographs at issue, and again the defendant failed to deny that the behavior in the photographs took place while she was on probation. In arguing that "I'm not sure there's any way to prove that [the behavior depicted in the photographs] was during the period of probation," the defendant merely challenged the probative force of the evidence itself, not the underlying truth to which the evidence purportedly speaks. Neither before the trial court nor in her appellate brief has the defendant claimed that the Facebook photographs in fact depict her activities exclusively prior to probation. See *State* v. *Eric M.,* supra, 271 Conn. 653 ("[s]ignificantly, [the defendant] never disputed having made the statements to the author, nor did he take the opportunity to quarrel with the author's construal of his remarks"). The defendant further failed to challenge the state's characterization of her hair color as a reliable basis for distinguishing between photographs taken of her while on probation and those taken prior to her incarceration. Finally, although the defendant perhaps would not have had sufficient time to fully assess each individual photograph at the sentencing hearing, her failure to seek a continuance in order to conduct such an analysis merely reinforces the inference that the accuracy and timing of the photographs were not subject to challenge. See id. ("[n]or did [the defendant] seek a continuance to afford himself the opportunity to address the article").

Under these circumstances, because the state has articulated an uncontradicted basis for determining whether each of the challenged images depicted the defendant before or during probation and because the defendant has failed to contest that the photographs do in fact depict her while on probation,[8] we hold that

[8] It is apparent that the defendant has light colored hair in a number of the photographs submitted to the court, that some photographs in which the defendant has dark colored hair are catalogued as "random old pics"

the photographs contained the minimal indicia of reliability necessary to pass constitutional muster in the context of a probation revocation hearing.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

and that the defendant does not appear in some of the photographs at all. The defendant, however, does not renew on appeal her initial objection that the court should have refrained from considering some or all of the photographs because they are extraneous to the issue of the defendant's behavior on probation.